**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                           )
**ANTHONY J. MOREAU,**        )
                           )
    **Plaintiff,**         )
                           )    **Civil Action No.**
    **v.**               )    **08-40117-FDS**
                           )
**BRIAN P. GERARDI, JR., JOHN DOE, and** )
**CITY OF WORCESTER,**     )
                           )
    **Defendants.**       )
_____)

**MEMORANDUM AND ORDER ON**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**SAYLOR, J.**

    This is a civil rights action against a police officer and the City of Worcester arising out of injuries that occurred while an arrestee was in police custody.  On June 25, 2005, plaintiff Anthony Moreau was arrested for disorderly conduct and disturbing the peace.  Moreau arrived at the police station intoxicated, but without visible injuries to his face and neck.  During his booking and processing, Moreau felt provoked by defendant Officer Brian Gerardi, and at one point needed to be restrained.  Gerardi later escorted Moreau to a cell, opened the cell door, and put him inside.  As he closed the door, Gerardi banged on the clear plastic above the door, and may have reached for the cell key.  Moreau asserts that at that moment, he fell unconscious.  The next thing he remembers is waking up with his head in the cell toilet, a black eye, and a bloody cut above his ear.

    Moreau alleges that Gerardi must have caused his injuries, because Gerardi had exhibited

hostility towards him and was the only person with the key to his cell.  Gerardi denies causing any injuries, and insists that he observed Moreau conscious and uninjured in a subsequent safety check of the cell.

Moreau has brought various civil rights and tort claims against Gerardi and an Officer "John Doe."[1]  He has also asserted a state law claim against the City of Worcester for negligent protection, supervision, and care while he was in custody.  Defendants have moved for summary judgment as to all counts.  They contend that Moreau has not alleged specific facts sufficient to survive summary judgment because he was unconscious during the incident that caused his injuries.  In defendants' view, Moreau merely attacks the credibility of Officer Gerardi's version of the facts, and does not offer affirmative evidence sufficient to sustain a verdict in his favor.

For the reasons stated below, defendants' motion for summary judgment will be granted in part and denied in part.

## I.      Factual Background

The Court provides the facts in the light most favorable to plaintiff, the non-moving party.

### A.      The Incident Preceding Moreau's Arrest

Anthony Moreau is a resident of Worcester, Massachusetts.  On June 24, 2005, the day before the incident at issue in this case, his girlfriend Amber Rousseau gave birth to the couple's second child.  Moreau celebrated the birth of his son with friends on the afternoon of June 25, 2005.  Throughout that afternoon, he drank several beers and hard liquor.  (A. Moreau Dep. at 42-43).

Around dinnertime that evening, Moreau asked his friend Mike Smith to drive him to the

---

[1] The parties have agreed to dismiss all claims against the unknown John Doe defendant.

home of Rousseau's mother and step-father.  Once there, Moreau asked Rousseau's mother, Dawn Laythe, to lend him money.  He became "belligerent" when she refused his request. (Laythe Dep. at 18).  Hearing the commotion, Rousseau's stepfather, Brian Laythe, came out to intervene.  He and Moreau began yelling at each other; the confrontation eventually became heated enough that the two tackled each other and toppled to the ground.  In the fight that ensued, neither Moreau nor Laythe landed any punches, but instead wrestled on the front lawn, grabbing each other's arms and shoulders.  (Laythe Dep. at 22-23; A. Moreau Dep. at 47-48). Meanwhile, another family member had called the police, who showed up shortly thereafter.

Both Moreau and Brian Laythe testified that Laythe did not hit or otherwise come into contact with Moreau's face and neck.  (Laythe Dep. at 28-29; A. Moreau Dep. at 56-57). Additionally, both testified that the struggle wholly occurred on the grass of the front lawn, not any hard surfaces.  (Laythe Dep. at 23-24; A. Moreau Dep. at 49-50).

### B.   Moreau's Arrest

The police officers quickly separated Moreau and Laythe when they arrived at the house. Laythe informed the officers about the events leading up to the fight and told them that Moreau had consumed alcohol all afternoon.  (Laythe Dep. at 29).  Moreau put up some resistance to the officers' requests for his name and identification, which led to his arrest for disorderly conduct and disturbing the peace.  (A. Moreau Dep. at 59-60).  He was still intoxicated at the time.  (A. Moreau Dep. at 64).  During the arrest, the officers put their hands on Moreau's body to position him for handcuffs and maneuver him into the police cruiser, but did not strike him.  (Laythe Dep. at 31, 33, 34).

### C.     The Events at the Police Station

Moreau was placed in the holding area of the police station when he arrived.  At one point, two officers came to the holding area to tighten Moreau's handcuffs, as he had moved them to the front of his body.  (A. Moreau Dep. at 75-77).  Gerardi was one of the officers; Moreau testified that at that point, Gerardi said, "You don't know me, I'm known for beating people up." (*Id.* at 76-77, 80-81, 106-07).[2]

Later that evening, Moreau was brought to the booking area to be fingerprinted and photographed.  He was permitted to make a telephone call afterwards, which he placed to Rousseau.  Still intoxicated, he was crying as he spoke on the phone.  (*Id.* at 91; Gerardi Dep. at 11).  Moreau alleges that during this call, Gerardi "puckered up his face and squinted his eyes as if he was crying and . . . balled his fists up . . . and rubbed his eyes."  (A. Moreau Dep. at 91). Moreau interpreted these gestures as derisive "baby faces," intended to make fun of him for crying.  (*Id.* at 88, 91-92).  Gerardi insists that he did not make any "baby face" gestures toward Moreau, but might have rolled his eyes.  (Gerardi Dep. at 13-14).  In any event, both parties agree that in response, Moreau angrily slammed down the phone and needed to be restrained.  (A. Moreau Dep. at 92; Gerardi Dep. at 14; Condo Dep. at 15).

Gerardi and another officer then escorted Moreau to a jail cell.  Gerardi held the key to the cell, and used it to unlock the cell door, open it, put Moreau inside, and close and relock the cell door.  (A. Moreau Dep. at 95-96; Gerardi Dep. at 14).  No one else was in the cell.  (A. Moreau

---

[2] In his deposition, Gerardi did not directly deny that he made this statement.  He did testify that he met Moreau for the first time in the "cell room," which is "where [the WPD] process[es] prisoners that are brought in under arrest."  (Gerardi Dep. at 7, 10).  It is unclear whether the cell room is the same room as the holding area, but Gerardi's testimony suggests that it is a separate space from the booking area.  (*Id.* at 9 (describing the "holding tank" area as distinct from the booking area)).  If the cell room and holding area are the same space, nothing in Gerardi's testimony disputes Moreau's account of this initial interaction between the two men.

Dep. at 96).  Gerardi testified that during this process, Moreau was upset that his call had ended and repeatedly demanded to make another call.  (Gerardi Dep. at 19).[3]  Gerardi tried to explain to Moreau that there was a phone in the cell that could be used.  (Gerardi Dep. at 19-20).  After closing the cell door and removing the key, Gerardi banged on the clear plastic above the cell door with his hand.  (A. Moreau Dep. at 96; Gerardi Dep. at 20, 34).

A video camera was recording the events in the booking room and the cell area up until this point.  The video shows the other officers walking away as Gerardi closed the door and withdrew the key.  (Gerardi Dep. at 34).  Immediately after Gerardi banged on the clear plastic, however, the camera stopped recording.  (*Id.*).[4]

Moreau alleges that immediately after Gerardi hit the clear plastic, he pulled the cell key out of his pocket and reopened the cell door.  (A. Moreau Dep. at 96-97).[5]  At some point, Moreau reports that he became unconscious, and that his next memory is awakening.  (*Id.* at 97-98, 101).  He does not remember whether Gerardi entered the cell.  (*Id.* at 97).  The complaint alleges that Gerardi opened the cell and assaulted Moreau, which made him lose consciousness.  (Compl. ¶¶ 15, 16).  Gerardi then allegedly moved Moreau's body so that it was kneeling in front of the toilet in the cell.  (*Id.* ¶ 16).  Because he was unconscious during the alleged assault,

---

[3] Moreau testified that he never said anything to the officers about the phone in the cell.  (A. Moreau Dep. at 95).  His testimony does not make clear whether he asked to make another telephone call or whether any of the officers tried to explain how to use the telephone in the cell.  (*Id.*)

[4] Reviewing the video during his testimony, another officer, Captain O'Rourke, asserted that he saw Officer Gerardi start to turn away from the cell door right before the tape recording ends.  (O'Rourke Dep. at 33-34).

[5] Moreau's testimony on this point is inconsistent.  He twice asserts that he saw Gerardi open the cell door, but then later reports that he only saw Gerardi remove the key from his pocket, and in fact does not remember Gerardi opening the cell door.  (*Compare* A. Moreau Dep. at 97, *with id.* at 98, 100-01).  Julie Moreau, Anthony Moreau's mother, testified that in his telephone call to her asking for her to bail him out, Moreau said: "The guy got upset and he punched the wall, the window on the thing, and he came through the door and I remember him hitting me in the face and then I don't know what happened after that."  (J. Moreau Dep. at 17).

however, Moreau has no direct evidence that Gerardi hit him and then repositioned his body.

Gerardi testified that he did not take the cell key out of his pocket, reopen the door, or enter the cell.  (Gerardi Dep. at 20).  He also insists that he did not assault Moreau at that time.  (*Id.*)[6]  To the contrary, Gerardi testified that later in the evening he performed several routine checks of the cell, and each time saw Moreau conscious and uninjured.  (*Id.* at 24).

### D.   The Injuries to Moreau

Moreau next remembers awaking in a kneeling position with his head dangling above the cell toilet, his hair in the toilet water.  (A. Moreau Dep. at 102-03).  After regaining his senses, he noticed that his left ear and eye were throbbing.  (*Id.* at 103-04).  Blood was dripping down his neck from what he later realized was a cut behind his ear.  (*Id.* at 104).  He noticed the telephone in the cell at that point, and called his relatives collect to ask them to bail him out.  (*Id.* at 108-09).  After his mother posted bail in the early morning hours of June 26, Moreau pleaded guilty to the disorderly conduct charge and was released.[7]

The parties agree that Moreau arrived at the police station without visible injuries to his neck and face.  (*See* A. Moreau Dep. at 94; Gerardi Dep. at 22; Condo Dep. at 19; O'Rourke Dep. at 24-25, 26).  There is a dispute, however, as to whether Moreau was injured when he left the police station.  Moreau testified that when he left the station, he had a black eye, a cut behind his ear, blood on his neck, and bruising and fingerprints on his neck.  (A. Moreau Dep. at 114-19;

---

[6] An uncontroverted affidavit filed in March 2010 by police Captain Jeremiah O'Rourke reports that, aside from this case, there have been no complaints filed against Gerardi and that Gerardi has no disciplinary record within the Worcester Police Department.  (O'Rourke Aff. ¶¶ 4, 5).

[7] The charge of disturbing the peace was dropped.  (A. Moreau Dep. at 139-40).

*see also* J. Moreau Dep. at 23, 28, 31).[8]  Gerardi, on the other hand, testified that as he performed security checks that evening, he did not notice any face or neck injuries while Moreau was in his cell.  (Gerardi Dep. at 24).

There is a video recording of Moreau gathering his belongings in the station before he is discharged; a supervising officer later reviewing the recording maintained that he did not notice any injuries on Moreau's face at that time.  (O'Rourke Dep. at 16, 30).  Moreau went to the hospital on June 26 for medical treatment; the medical records report that he had a black eye and a "suspicious left nasal bone fracture."  (Exh. 11).

## II.      Procedural Background

In June 2008, Moreau brought suit under 42 U.S.C. § 1983 against Gerardi and Officer "John Doe."  His complaint alleged that the officers violated his Fourth and Fourteenth Amendment rights.  He also brought related state law claims for assault and battery and violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I.  Against the City of Worcester he brought an additional claim under Mass. Gen. Laws ch. 258 for municipal negligence.

## III.     Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "Essentially, Rule 56(c) mandates the entry of summary judgment 'against a party who fails to make a showing

---

[8] This claim is supported by photographic evidence taken the day after Moreau's arrest.  (*See* Laythe Aff., Exh. 13; Exh. 10).

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making this determination, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).

When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id*. at 256-57.  There is no issue for the trier of fact to resolve when the nonmoving party merely attacks the credibility of witnesses. *See LaFrenier v. Kinirey*, 550 F.3d 166, 167 (1st Cir. 2005); *Sears, Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 18 (1st Cir. 1997); *Moreau v. Local Union No. 247*, 851 F.2d 516, 519 (1st Cir. 1988).  To prevail, the non-moving party must put forth sufficient evidence that "a jury might return a verdict in his favor." *Anderson*, 477 U.S. at 257.  When causation of harm is disputed, the plaintiff has the burden to present sufficient evidence that a jury could reasonably infer that the defendant caused the harm. *See Sullivan v. City of Springfield*, 561 F.3d 7, 15 (1st Cir. 2009).

**IV.    Analysis**

### A.     <u>Whether Plaintiff Has Presented Affirmative Evidence or Merely Attacked Defendant's Credibility</u>

Gerardi has moved for summary judgment on the grounds that Moreau has merely attacked the credibility of his testimony and has failed to offer affirmative evidence as to what occurred in the jail cell. On Gerardi's view, absent any direct evidence to the contrary, the Court must credit his testimony that he did not assault Moreau or leave him face-down in the toilet. Citing *LaFrenier*, Gerardi argues that because Moreau's claims rely entirely on disbelief of his testimony, the action must fail as a matter of law. *See* 550 F.3d at 167.

As an initial matter, it is clear that several material facts remain in dispute. Most fundamentally, the parties disagree about whether Moreau was ever unconscious in his cell and whether he was injured when he left the police station. (*Compare* A. Moreau Dep. at 97-98, 103-04, 114-19, *and* J. Moreau Dep. at 23, 28, 31, *with* Gerardi Dep. at 24, *and* O'Rourke Dep. at 16, 31, 36. Whether Gerardi said, "I'm known for beating people up" and later made mocking "baby faces" at Moreau is also contested. (*Compare* A. Moreau Dep. at 76-77, 80-81, 88, 91-92, 106-07, *with* Gerardi Dep. at 13-14). Finally, Moreau's assertion that Gerardi pulled the cell key out of his pocket and reopened the cell door after banging on the plastic is disputed. (*Compare* A. Moreau Dep. at 96-97, *with* Gerardi Dep. at 20).

When these factual disputes are viewed in the light most favorable to Moreau, there is a sufficient factual basis from which a jury could reasonably infer that Moreau was injured while in the cell and that Gerardi was the cause of the injuries. *See Sullivan*, 561 F.3d at 15. Moreau's testimony alleges three instances of hostile behavior from Gerardi over the course of the evening: (1) the statement "I'm known for beating people up" (A. Moreau Dep. at 76-77, 80-81, 106-07);

(2) the "baby faces" episode (*id.* at 88, 91-92); and (3) the undisputed account of Gerardi banging on the plastic above the cell door (*id.* at 96; Gerardi Dep. at 20, 34).   Moreau has also produced evidence that Gerardi was the only officer with a key to the cell, that Gerardi removed the key from his pocket, that the episode occurred after the other officers had left the area, and that the episode occurred after the video inexplicably stopped recording.   (A. Moreau Dep. at 96-97).   In addition, Moreau has presented evidence that he was not injured when he entered the cell, but had a black eye and bloody cut above his ear after he regained consciousness in the cell.   (*Id.* at 114-19).   Taken together, this affirmative evidence could create a reasonable inference that Gerardi in fact assaulted Moreau, causing him to lose consciousness.   The Court expresses no opinion as to the issue; it is for the jury to decide which version of events is more credible.   *See Anderson*, 477 U.S. at 250.

LaFrenier does not require a different conclusion.   The plaintiff in *LaFrenier* had no memory of the events that led to his injuries.   *See* 550 F.3d at 167.   Yet unlike Moreau, the *LaFrenier* plaintiff offered no affirmative evidence to contradict the officers' version of the events that caused the injuries.   *Id.* ("LaFrenier agrees he has no affirmative evidence contrary to the defendants' evidence.").   Instead, he challenged the credibility of the officers' accounts by pointing to inconsistencies in the officers' testimony and by arguing that their testimony was inherently unbelievable.   *Id.*   Without any disputed material facts, the court could only accept the officers' version of the story.   *LaFrenier v. Kinirey*, 478 F. Supp. 2d 126, 134-35 (D. Mass. 2007).   Based on that uncontested account of the events, no reasonable jury could have concluded that the plaintiff's federal and state civil rights had been violated.   *Id.* at 137, 139, 140.

By contrast, Moreau does not merely attack Gerardi's credibility.   He has also put forth an

affirmative version of the facts that differs from defendants' version.  The mere fact that Moreau

has no recollection of the alleged assault itself does not indicate that there is no genuine dispute of

facts; rather, plaintiffs' evidence, although circumstantial, is sufficient for a jury to infer that it is

more likely than not that Gerardi caused his injuries.  *Cf. Powers-Bunce v. District of Columbia*,

576 F. Supp. 2d 67, 71 n.5 (D.D.C. 2008) (granting summary judgment to officers when plaintiff

"offered no substantive evidence that suggests a scenario different from that provided by

[defendants' declarations] or consistent with her theory of the case").

In sum, after drawing all reasonable inferences in favor of Moreau, there is sufficient

affirmative evidence that a reasonable jury could find that he was injured while in his cell and that

an assault by Gerardi was the cause of his injuries.

**B.**      **The Specific Claims**

The Court turns next to the issue of whether the evidence is sufficient to support the

claims.

**1.**      **Section 1983 (Count 1)**

Section 1983 is not itself a source of substantive rights, but rather provides a means for

vindicating rights conferred by the Constitution or laws of the United States.  *See Graham v.

Connor*, 490 U.S. 386, 393-94 (1989).  Moreau's complaint identifies both the Fourth

Amendment and the Fourteenth Amendment Due Process Clause as the source of the substantive

rights allegedly infringed by Gerardi.  The constitutional claim is based on the use of excessive

force.

"In addressing an excessive force claim brought under § 1983, analysis begins by

identifying the specific constitutional right allegedly infringed by the challenged application of

11

force." *Graham*, 490 U.S. at 394.   Although it is beyond dispute that custodial detainees have a constitutional right not to be subjected to excessive force, the source of that right is surprisingly unclear.   Both the Fourth and the Eighth Amendments provide protection against excessive force in certain contexts.   *Id.*   Excessive force claims arising in the context of an arrest are governed by the Fourth Amendment, and are evaluated under an "objective reasonableness" standard.   *Id.* at 395.   Excessive force claims brought by convicted and sentenced inmates are governed by the Eighth Amendment, and are evaluated under a "malicious or sadistic use of force" standard. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992); *Whitley v. Albers*, 475 U.S. 312, 318-22 (1986); *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977).

The incident in this case arose after arrest but before sentencing, during a time in which Moreau was a custodial detainee.   This time period has been termed a "legal twilight zone," as the Constitution does not clearly indicate the source of protection against the use of excessive force against such persons.   *Wilson v. Spain*, 209 F.3d 713, 715 (8th Cir. 2000).   Although it is clear that the Eighth Amendment does not apply, whether the Fourth Amendment should apply, or whether the issue should be analyzed under the Due Process Clause of the Fourteenth Amendment, is a matter of some dispute.   The Supreme Court has expressly declined to decide the question of "whether the Fourth Amendment continues to provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins."   *Graham*, 490 U.S. at 395 n.10.

This lack of constitutional clarity has led to a circuit split.   Four circuits have held that the Fourth Amendment provides the constitutional standard of review for claims of intentional excessive force that arise after a warrantless arrest but before a probable cause hearing or

arraignment.  *See Aldini v. Johnson*, 609 F.3d 858, 867 (6th Cir. 2010); *Pierce v. Multnomah County*, 76 F.3d 1032, 1042-43 (9th Cir. 1996); *Austin v. Hamilton*, 945 F.2d 1155, 1160 (10th Cir. 1991), *abrogated on other grounds*, *Johnson v. Jones*, 515 U.S. 304 (1995); *Powell v. Gardner*, 891 F.2d 1039, 1043-44 (2d Cir. 1989); *see also Wilson*, 209 F.3d at 714-16 (holding that the Fourth Amendment applies to an application of force that occurred during in a holding cell after booking, but declining to set a bright line rule); *United States v. Johnstone*, 107 F.3d 200, 206-07 (3d Cir. 1997) (holding that the Fourth Amendment governs an assault by a police officer in the garage of the police station, an incident that occurred before pretrial detention, and noting that "a 'seizure' can be a process, a kind of continuum, and is not necessarily a discrete moment of initial restraint").  Four other circuits have held that the Fourth Amendment becomes inapplicable after the act of arrest, and instead analyze post-arrest claims of excessive force as substantive due process claims under the Fourteenth Amendment.  *See Riley v. Dorton*, 115 F.3d 1159, 1162-63, 1166 (4th Cir. 1997); *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996); *Brothers v. Klevenhagen*, 28 F.3d 452, 455-56 (5th Cir. 1994); *Wilkins v. May*, 872 F.2d 190, 192, 195 (7th Cir. 1989).  The First Circuit has not yet determined what constitutional provision provides the source of protection and the applicable standard of review in this context.[9]

The circuits embracing the Fourteenth Amendment as the operable provision have reasoned that neither the text nor the "core concerns" of the Fourth Amendment apply to custodial treatment.  *E.g.*, *Riley*, 115 F.3d at 1163; *Wilkins*, 872 F.2d at 192 ("[a] natural

---

[9] In *Brady v. Dill*, the First Circuit applied the Due Process Clause rather than the Fourth Amendment to evaluate the lawfulness of holding in custody a detainee who had been arrested pursuant to a valid warrant.  *See* 187 F.3d 104, 110 (1st Cir. 1999).  That case did not involve an excessive force claim and analyzed the lawfulness of detention pursuant to a arrest warrant supported by probable cause, so is not dispositive here.  The court also expressly distinguished the case from a case involving use of excessive force, acknowledging that *Graham* left open the question of whether the Fourth Amendment continues to apply in the excessive force context.  *Id.* at 110 n.5.

although not inevitable interpretation of the word 'seizure' would limit it to the initial act of

seizing").  Those courts see the Fourth Amendment and the body of case law it has generated as

directed at the "initial act of restraining an individual's liberty" rather than conditions occurring

after a seizure or arrest is made.  *Valencia v. Wiggins*, 981 F.2d 1440, 1444 (5th Cir. 1993); *see

also Riley*, 115 F.3d at 1162 ("Decades of Fourth Amendment precedent have focused on the

initial deprivation of liberty.").  Some courts have expressed concern that because there is no

obvious principled basis for limiting the reach of the Fourth Amendment, the Due Process Clause

should apply after the point of seizure.  *See Wilkins*, 872 F.2d at 194.  Some have also interpreted

*Bell v. Wolfish*, 441 U.S. 520, 535 (1979), and *Graham*, 490 U.S. at 395 n.10, as instructing

courts to use a due process analysis in this context.  Noting the *Graham* Court's statement that

"the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts

to punishment," those courts would apply a due process analysis to any excessive force claims

that arise after the moment of arrest.  *E.g.*, *Riley*, 115 F.3d at 1162; *Valencia*, 981 F.2d at 1445.[10]

   Courts that apply the Fourth Amendment to excessive force claims in this context have

articulated three principal reasons for doing so.  First, they have noted that *Wolfish* does not

---

[10]  In *Wolfish*, the Court noted that "under the Due Process Clause, a detainee may not be punished prior
to an adjudication of guilt in accordance with due process of law" and "a person committed to pretrial detention
has not been lawfully adjudged guilty of any crime." *Wolfish*, 441 U.S. at 535-36.  After reserving the question of
whether the Fourth Amendment continues to protect individuals against excessive force after arrest, the *Graham*
Court reaffirmed that dicta, writing, "It is clear . . . that the Due Process Clause protects a pretrial detainee from
the use of excessive force that amounts to punishment." *Graham*, 490 U.S. at 395 n.10 (citing *Wolfish*, 441 U.S. at
535-39).  Taken together, the Court's statements seem to distinguish between excessive force that amounts to
punishment and excessive force generally.  While it is no easy task to disentangle the two, it is at least clear that
the Fourteenth Amendment applies to the former.  Puzzling through the distinction, the Ninth Circuit has treated
the substantive due process protections against force intended to punish as a kind of constitutional minimum, while
still holding that the Fourth Amendment protects arrestees subject to excessive force prior to a probable cause
hearing.  *Compare Pierce*, 76 F.3d at 1042-43 (holding that the Fourth Amendment governs excessive force claims
that occur post-arrest and pre-arraignment), *with Hallstrom v. City of Garden City*, 991 F.2d 1473, 1485 (9th Cir.
1993) (holding that an arrestee who was held for six days without a probable cause hearing or arraignment was "*at
least* entitled to the protections afforded pretrial detainees" under the Fourteenth Amendment, without considering
whether the Fourth Amendment governed the claim).

govern excessive force claims that occur before probable cause hearings, as the Supreme Court

defined a "pretrial detainee" as someone who has had a "judicial determination of probable cause

as a prerequisite to [the] extended restraint of [his] liberty following arrest." *Wolfish*, 441 U.S. at

536 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)); *Aldini*, 609 F.3d at 865.  This

definition suggests that someone who has not had a probable cause hearing is not a "pretrial

detainee" whose claims are analyzed under a due process standard.  *Aldini*, 609 F.3d at 866.

Second, they have observed that neither the Constitution's text nor Supreme Court precedent

provides a principled basis for demarcating the end of Fourth Amendment protection and the

beginning of Fourteenth Amendment protection.  *Id.*  To fill the constitutional gap, the courts

have looked to judicial process that changes the legal status of an arrestee to draw a dividing line.

*Id.*  Because an arraignment or a probable cause hearing constitutionally authorizes detention, and

changes someone's status from an "arrestee" to a "pretrial detainee," courts have viewed

treatment of arrestees before these processes as falling under a different doctrinal regime than

treatment of detainees.  *See id.*  Third, several courts have placed weight on precedents that

assess the constitutionality of the *duration* of and *legal justification* for warrantless, post-arrest,

pre-arraignment detentions under the Fourth Amendment.  *See, e.g.*, *Pierce*, 76 F.3d at 1043

(citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991) (holding that the Fourth

Amendment usually requires a probable cause hearing within 48 hours of a warrantless arrest);

*Gerstein*, 420 U.S. at 114 (holding that "the Fourth Amendment requires a judicial determination

of probable cause as a prerequisite to extended restraint of liberty following arrest")); *Austin*, 945

F.2d at 1160.  They reason that, by extension, the Fourth Amendment should also govern the

*treatment* or *condition* of arrestees in the same context.  *Pierce*, 76 F.3d at 1043; *Austin*, 945 F.2d at 1160.

Determining the applicable constitutional provision is not a merely technical exercise, as the burden that the plaintiff must meet is substantially different under the Fourth and Fourteenth Amendments.  *See Porro v. Barnes*, — F.3d —, 2010 WL 4456990, at *2 (10th Cir. 2010) ("Excessive force claims can be maintained under the Fourth, Fifth, Eighth, or Fourteenth Amendment—all depending on where the defendant finds himself in the criminal justice system—and each carries with it a very different legal test."); *Aldini*, 609 F.3d at 864.  An excessive force analysis under the Fourth Amendment looks to the objective reasonableness of the officer's actions, without inquiring into the subjective motivations of the officer.  *Graham*, 490 U.S. at 397-98.  By contrast, when conducting a substantive due process analysis, courts ask whether an officer's conduct "is so beyond the norm of proper police procedure as to shock the conscience."  *Wilkins*, 872 F.2d at 195; *see also Riley*, 115 F.3d at 1168 n.4.  Other courts that deem the Fourteenth Amendment the operative provision ask whether the police conduct is applied "maliciously and sadistically" for the purpose of causing harm.  *E.g.*, *Valencia*, 981 F.2d at 1446.  Several courts have noted that the Fourteenth Amendment analyses are more burdensome to plaintiffs than the Fourth Amendment analysis.  *See, e.g.*, *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001) ("A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the 'objective reasonableness' test of [the Fourth Amendment] . . . ."); *Wilson*, 209 F.3d at 716 ("[I]f [plaintiff] cannot win . . . under Fourth Amendment standards, it is a certainty he cannot win . . . under the seemingly more burdensome, and clearly no less burdensome, standards that must be met to

16

establish a Fourteenth Amendment substantive due process claim.").

Understanding why the standards differ requires a brief detour through some early precedents. The "shocks the conscience" standard employed by some courts originated in *Rochin v. California*, 342 U.S. 165, 172 (1952), a case in which the Supreme Court held that substantive due process protected a suspect whose stomach was forcibly pumped for drug evidence. *See Riley*, 115 F.3d at 1168 n.4; *Wilkins*, 872 F.2d at 195. In a pre-*Graham* opinion, the Second Circuit had cited *Rochin* in support of the application of substantive due process to a claim by a pretrial detainee that he had been beaten by a corrections officer as he checked into a jail. *Johnson v. Glick*, 481 F.2d 1028, 1032-33 (2d Cir. 1973), *abrogated by Graham*, 490 U.S. at 397. The court in that case created a four-factor analysis that gave content to the substantive due process standard; one of the factors was "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Glick*, 481 F.2d at 1033. After *Glick*, several circuits applied this test to all excessive-force claims. *Graham*, 490 U.S. at 393. In *Graham*, the Supreme Court rejected application of the *Glick* test "indiscriminately to all excessive force claims lodged against law enforcement and prison officials under § 1983," instructing lower courts to identify first the governing constitutional provision. *Id.* at 393-94. In the context of an arrest, the Fourth Amendment required a reasonableness analysis, not an analysis of the officers' subjective intent. *Id.* at 396-97.

The Court did not clarify what standard should apply to claims analyzed under the Fourteenth Amendment after *Graham*. It has since reaffirmed the vitality of the "shocks the conscience" test for substantive due process claims, which is to be applied differently depending on context and changing circumstances. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846,

850-51 (1998).  The four circuits that employ a substantive due process analysis for all post-arrest

excessive force claims have embraced some variation of that standard, albeit taking into account

different factors and calling it by different names.[11]

　　　From a practical standpoint, however, it is not clear why a plaintiff should be held to a

higher standard of proof depending on his claim arises at the moment of arrest, as he is an arrestee

in police custody, or as he is a pretrial detainee after a probable cause hearing.  Indeed, it makes

little sense to do so.  Consider three different scenarios of police brutality:  Person A is beaten

excessively by the police on a sidewalk in the course of an otherwise-lawful arrest; Person B is

beaten excessively in the police station lockup, after arrest but before any appearance before a

judicial officer; and Person C is beaten excessively in the police station lockup after a judicial

officer has made a probable cause determination.  Why should A have an easier standard of proof

than C?  And why should B and C have different standards of proof, simply because the detention

has been found to be lawful?  Either the use of force under the circumstances is justifiable, or it is

not.  The factual circumstances might change from scenario to scenario, but the ultimate question

ought to remain the same:  was the use of force, viewed objectively, excessive under the

circumstances?  Requiring one plaintiff to meet a higher standard of proof than another elevates

doctrine over fairness and common sense.

　　　Taking all these considerations into account, the Court concludes that Moreau's § 1983

claim is most appropriately analyzed under the Fourth Amendment.  From a practical standpoint,

---

[11] While most courts assert that the substantive due process analysis imposes a higher burden than the
"objective reasonableness" test, in practice is it not always obvious that a Fourteenth Amendment analysis differs
much from an objective reasonableness analysis.  Indeed, the Fifth Circuit acknowledged that "[o]ften, of course,
there will be no evidence of the . . . official's subjective intent, and the trier of fact must base its determination on
objective factors suggestive of intent."  *Valencia*, 981 F.2d at 1446.  The objective factors identified by the Fifth
Circuit embrace reasonableness and could fit comfortably within the Fourth Amendment balancing approach.
*Compare Graham*, 490 U.S. at 396 (describing the objective factors), *with Valencia*, 981 F.2d at 1446-47 (same).

employing the Fourth Amendment has the virtue of the "objective reasonableness" standard and provides of consistency and fairness among similarly-situated individuals.  And as a matter of doctrine, this approach is more consistent with the relevant Supreme Court cases.

As an initial matter, *Wolfish* does not provide a clear basis for analyzing claims of excessive force that arise in an early stage of custodial detention.  *See* 441 U.S. at 535-36. *Wolfish* applied the due process clause to evaluate conditions of confinement, such as double-bunking of detainees, in a pretrial detention center.  *Id.* at 541.  It was not a case involving an excessive force claim, and the Supreme Court did not have occasion to consider whether to what extent the Fourth Amendment may continue to apply to arrestees after the initial act of arrest.  *See id.* at 535-39.  The fact that, a decade later in *Graham*, the Court expressly reserved the question of whether the Fourth Amendment applies to allegations of excessive force in custodial detention after arrest indicates that the Court did not view *Wolfish* as settling the question.  *Graham*, 490 U.S. at 395 n.10.[12]

Courts have also been reluctant to extend the scope of substantive due process when another constitutional provision provides a source of protection.  *See County of Sacramento*, 523 U.S. at 842; *Albright*, 510 U.S. at 271-72.  Substantive due process is a "generalized" concept, and "the guideposts for responsible decisionmaking in this unchartered area [of substantive due process jurisprudence] are scarce and open-ended."  *Albright*, 510 U.S. at 272 (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)); *see also Graham*, 490 U.S. at 395.  The indeterminate nature of judicial review under a substantive due process lens is underscored by the

---

[12] To the extent that the *Wolfish* Court did attempt to draw a constitutional line between certain kinds of pretrial detainees and arrestees, it made clear that the case applied to detainees as to whom a probable cause determination had been made.  *See id.* at 533-34, 536.  It is thus not instructive in a case, such as this one, where an arrestee is held before a probable cause determination.

various standards of review courts employ when reviewing excessive force claims under the Fourteenth Amendment.

The fact that the Supreme Court has previously determined that the Fourth Amendment provides the doctrinal standard for analyzing the legal justification for and the duration of custodial detentions does suggest that the Fourth Amendment is the appropriate provision to also govern treatment of arrestees in custody. *See Pierce*, 76 F.3d at 1043; *Austin*, 945 F.2d at 1160. An arrestee is still effectively "seized" by police when he is brought to the police station, booked, and detained before a probable cause hearing or before arraignment. *See Albright*, 510 U.S. at 276-81 (Ginsburg, J., concurring). Within the comparatively safer conditions of a police station as opposed to the conditions surrounding the moment of arrest, it is more constitutionally incumbent on officers restraining individuals' liberty to be reasonable in their use of force.

For the purposes of this case, the Court need not explore the outer bounds of where Fourth Amendment protection ends and Fourteenth Amendment protection begins. It is enough to conclude that the Fourth Amendment governs Gerardi's treatment of Moreau, who had only been in custody for a few hours after his arrest, had just completed the booking process, and had not been arraigned or received a probable-cause determination. The question on summary judgment, then, is whether the facts, viewed in the light most favorable to Moreau, could lead a reasonable jury to conclude that Gerardi's treatment of Moreau was objectively unreasonable.

An objective reasonableness analysis involves "a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Factors to consider are the severity of the crime at issue, the threat the arrestee

poses to the safety of officers and others, and whether the arrestee is actively resisting arrest or attempting to evade arrest by flight. *Id.* Courts have also held that "gratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment." *Fontana v. Haskin*, 262 F.3d 871, 880 (9th Cir. 2001) (citing cases).

After making all inferences in favor of Moreau, it is clear that a jury could conclude that Gerardi acted unreasonably. If Gerardi did in fact assault Moreau, causing his injuries, such action would be patently unreasonable. Viewing the facts in the light most favorable to plaintiff, Gerardi had locked Moreau in his cell, and Moreau presented no danger to himself, to any officer, or to other arrestees. He was not attempting to flee. Even if Moreau was loudly and angrily demanding a phone call, there would have been no objective need or reason to reopen the cell and assault Moreau.[13] Summary judgment on the § 1983 claim must therefore be denied.

## 2.      Massachusetts Civil Rights Act (Count 2)

The Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I, provides a cause of action to any person whose exercise or enjoyment of rights secured by the federal or state constitution or laws has been interfered with by "threats, intimidation, or coercion." *See Bally v. Northeastern Univ.*, 403 Mass. 713, 717, 532 N.E.2d 48 (1989). It is not entirely clear from the record what federal or state rights where interfered with by Gerardi's alleged threats, intimidation, or coercion. That is, if Gerardi assaulted Moreau, the assault could have been an end in itself rather than a coercive act intended to interfere with Moreau's subsequent exercise of rights. *Cf.*

---

[13] It is worth noting that, even if the Court applied a "shocks the conscience" or "malicious and sadistic" standard under a Fourteenth Amendment analysis, the record would still require denial of summary judgment. Moreau's testimony indicates that Gerardi could have subjectively intended to hurt Moreau, given the alleged record of Gerardi's hostile behavior throughout the detention. If, as Moreau alleges, Gerardi reopened the cell in order to assault Moreau, such treatment would be malicious and sadistic and shock the conscience of the Court or any reasonable person.

*Goddard v. Kelley*, 629 F. Supp. 2d 115, 128 (D. Mass. 2009) ("The problem is ascertaining the constitutional rights that the assault . . . were directed to:  what did the plaintiff give up that he had a constitutional right to do?").  On the other hand, defendants' summary judgment motion makes no specific arguments with respect to Moreau's claim under the MCRA.  Without offering a grounds for dismissing this claim, then, defendants are not entitled to summary judgment on Moreau's MCRA claim.  *See Kubetin v. Astrue*, 637 F. Supp. 2d 48, 59 (D. Mass. 2009).

### 3.    Assault and Battery (Count 3)

Massachusetts law defines assault and battery as "the intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another."  *Jesionowski v. Beck*, 937 F. Supp. 95, 105 (D. Mass. 1996) (quoting *Commonwealth v. McCan*, 277 Mass. 199, 203, 178 N.E.2d 633 (1931)). The standard for determining whether a police officer is liable for assault and battery is "essentially the same" as the standard for determining if the force applied was reasonable under a Fourth Amendment excessive force claim.  *Sietins v. Joseph*, 238 F. Supp. 2d 366, 380 (D. Mass. 2003) (citing *Dean v. City of Worcester*, 924 F.2d 364, 369 (1st Cir. 1991)).  Because summary judgment will be denied on the excessive force claim, it is also denied for the assault and battery claim against Gerardi.

### 4.    Municipal Negligence (Count 7) (sic)

Moreau also asserts a claim of negligence against the City of Worcester under the Massachusetts Tort Claims Act ("MTCA"), Mass. Gen. Laws ch. 258.  In relevant part, that statute provides that "[p]ublic employers shall be liable for injury or loss of properly or personal

22

injury or death caused by the negligent or wrongful act or omission of any public employee while

acting within the scope of his office or employment."  Mass. Gen. Laws ch. 258, § 2; *Spring v.*

*Geriatric Auth. of Holyoke*, 394 Mass. 274, 285, 475 N.E.2d 727 (1985) (noting that the MTCA

effectively removes the defense of immunity in certain tort action against public employers).

Section 10 of the MTCA carves out exceptions to the general rule of municipal liability for

negligence.  *See* Mass. Gen. Laws ch. 258, § 10.  The City contends that one of the

exceptions—section 10(c), which applies to "any claim arising out of an intentional torts,

including assault, battery, false imprisonment, false arrest . . . ."—bars Moreau's claim against the

City, because the claim arises out of the alleged intentional torts of assault and battery by Gerardi.

*Id.* § 10(c).

Moreau concedes that a municipality cannot be liable for the intentional torts of its

employees.  *See Sheehy v. Town of Plymouth*, 948 F. Supp. 119, 122, 123 (D. Mass. 1996).

However, he contends that Gerardi's alleged intentional torts were caused by the City's

negligence in investigating violence towards arrestees held in jail.  Cases construing the MTCA do

permit claims alleging that negligence preceding the intentional tort caused the injury.  *Sheehy*,

948 F. Supp. at 123, 124.  But municipal negligence that occurs after an intentional tort is not

cognizable under ch. 258, as that negligence "aris[es] out" of the intentional tort.  *See* Mass. Gen.

Laws ch. 258, § 10(c).

Here, Moreau has not offered facts that show any pattern of negligence in investigating

violence towards arrestees that preceded the incident in this case.  The testimony of Officer

O'Rourke demonstrates that the police department did not investigate the alleged incident, even

after presented with pictures of Moreau's injuries.  (O'Rourke Dep. at 28-30).  Moreau asserts

that the failure to investigate this alleged assault and battery is emblematic of a negligent culture

of accountability for officers.  But without any evidence of negligence in investigating officers'

violent conduct that precedes the incident in this case, the claim against the City cannot survive.

Accordingly, summary judgment on the claim under Mass. Gen. Laws ch. 258 will be granted.

**V.**      **Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED as

to the claims against Officer Doe (counts 4, 5, and 6) and the City of Worcester (count 7 (sic)).

Summary judgment is DENIED as to the claims against Officer Gerardi (counts 1, 2, and 3).

**So Ordered.**

_F. Dennis Saylor_

F. Dennis Saylor IV

Dated: November 24, 2010                    United States District Judge